# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO
## Senior Judge Marcia S. Krieger

Civil Action No. 20-cv-01539-MSK

**RONALD L. DAVISON,**

    Plaintiff,

v.

**COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,**

    Defendant.

## OPINION AND ORDER REVERSING AND REMANDING THE COMMISSIONER'S DECISION

**THIS MATTER** comes before the Court on the Plaintiff's Complaint **(#1)**, the Plaintiff's Opening Brief **(#16)**, the Defendant's Response Brief **(#20)**, and the Plaintiff's Reply Brief **(#22)**. For the following reasons, the Commissioner's decision is reversed and remanded.

## I. JURISDICTION

The Court has jurisdiction over an appeal from a final decision of the Commissioner under 42 U.S.C. § 405(g).

## II. BACKGROUND

### A. Procedural History

Plaintiff Ronald Davison ("Mr. Davison") seeks judicial review of a final decision by the Defendant Commissioner ("Commissioner") denying his applications for disability insurance benefits ("DIB") pursuant to Title II and supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act. In July 2017, Mr. Davison filed applications for DIB and SSI.

(**#14-2 at 10**). The SSA denied these claims at the initial level of review, and Mr. Davison requested a hearing before an administrative law judge ("ALJ"). (**#14-2 at 10**). On May 7, 2019, an ALJ held a hearing. (**#14-2 at 35**). At the hearing, Mr. Davison amended his disability onset date[1] from June 1, 2010 to September 13, 2015. (**#14-2 at 10**).

On June 5, 2019, the ALJ issued a Decision ("Decision") finding that Mr. Davison was not disabled from the onset date of September 13, 2015. (**#14-2 at 10**). Mr. Davison appealed the Decision to the Appeals Council asserting it was not supported by substantial evidence. On March 30, 2020, the Appeals Council denied his Request for Review. (**#14-2 at 1**).

Mr. Davison now appeals the Decision, as the final agency determination, to this Court. *See Threet v. Barnhart*, 353 F.3d 1185, 1187 (10th Cir. 2003).

**B.   Pertinent Factual Background**

The Court offers only a summary of the facts here, but elaborates as necessary in its discussion.

It is undisputed that on the alleged onset of disability, September 13, 2015, Mr. Davison was 45 years old. (**#14-2 at 20**). He had worked in the sheet metal industry operating a computer numerical control ("CNC") machine and as a stocker in a retail store. In 2012, Mr. Davison stopped working due to back pain that he attributed to lifting heavy metal material. (**#14-2 at 51-52**).

---

[1]   "The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations." *Gutierrez v. Astrue*, 253 F. App'x 725, 729 (10th Cir. 2007). The date last insured is the last day of the quarter a claimant's meets insured status for disability, and only disabilities existing before date last insured establish entitlement to disability insurance benefits. 20 C.F.R. § 404.130.

**Hearing Testimony**

At the hearing before the ALJ, Mr. Davison appeared in person and was represented by counsel. **(#14-2 at 35)**. He testified that in 2012, he was laid off from his sheet metal job due to a decline in business demand. He worked at that job for two years and testified that he would still be working there had he not been laid off. **(#14-2 at 51-52)**. Mr. Davison stated that he did not pursue other job opportunities due to increased back pain and declining health. **(#14-2 at 52-53)**. He also stated that this pain affects his balance and prevents him from standing for more than 60 minutes at a time, walking more than a short distance without taking a break, and lifting more than 10 pounds. He has taken medication and participated in conservative treatments – physical therapy and injections -- to alleviate his pain. **(#14-2 at 68-69)**.

In addition, Mr. Davison suffers from migraine headaches, depression, anxiety, and sleeplessness. He lives in his mother's garage and rarely ventures out due to his fear of being around other people and when he does, he is usually accompanied by his mother for support. He testified he can perform limited household chores and grooming tasks although it "takes a while". He prepares simple meals, attends medical appointments, and travels to the grocery store late at night to avoid contact with people. Mr. Davison regularly meets with a therapist. **(#14-2 at 45-52-56, 58-65, 68-73)**.

**Medical Evidence**

Pertinent to the arguments made by the parties is the following evidence found in the record. The medical records refer to Mr. Davison's depression and anxiety. **(#14-23 at 1399-2116)**. In mid-2016 through mid-2019, Mr. Davison was treated at Aspen Pointe, a mental health center. His treatment included monthly therapy sessions and medication management

visits.  At his initial treatment session, a mental status examination revealed largely normal results (intact memory, average intelligence, appropriate insight and judgment, appropriate affect and speech, and appropriate thought) with a nervous mood and drowsy appearance.  **(#14-23 at 1406)**.  Aspen Pointe psychiatrist Linton Holsenbeck, MD, diagnosed Mr. Davison as suffering from major depression and mild agoraphobia.  Dr. Holsenbeck recommended a treatment plan consisting of medication and psychotherapy.  **(#14-23 at 1428-1431)**.

Throughout 2016 and 2017, the treatment notes indicated Mr. Davison's mental condition improved and he reported a decrease in his depression and agoraphobia symptoms.  The treatment notes also reflect unremarkable mental status examinations.  **(#14-23 at 1441-1461, 1472-1482, 1487, 1492-1495; #14-24 at 1510-1512, 1538-1543)**.  In January 2017, psychiatrist Jason Curd, MD, noted Mr. Davison was "doing well overall" and his depression was in "partial remission".  **(#14-23 at 1472-1473)**.  In September 2017, Mr. Davison reported he was feeling more anxious likely due to an upcoming skin cancer surgery.  **(#14-24 at 1524)**.

Mr. Davison continued to have largely normal mental status examination results throughout 2018.  **(#14-24 at 1557-1560; #14-31 at 2009-2010, 2028-2029; #14-32 at 2060-2067, 2090-2095)**.  In August 2018, Mr. Davison's Patient Health Questionnaire ("PHQ-9") score was 8, indicating a mild level of depression[2].  Mr. Davison reported his symptoms had decreased the previous 6 months, and the treatment note indicated his depression is in "mild early remission."  **(#14-31 at 2046-2051)**.  However, Mr. Davison's depression and anxiety

---

[2]    The PHQ-9 is a "self-administered and diagnostic tool[] for mental health disorders". https://www.phqscreeners.com.  A PHQ-9 score of: 0-4 indicates "minimal depression"; 5-9 indicates "mild depression"; 10-14 indicates "moderate depression"; 15-19 indicates "moderately severe depression; and 20-27 indicates "severe depression". https://www.med.umich.edu/1info/FHP/practiceguides/depress/score.pdf.

symptoms subsequently increased in September and October 2018 due, in large part, to an upcoming knee surgery, family problems, and difficulty dealing with physical issues. **(#14-32 at 2070-2076)**.

Mr. Davison continued his mental health treatment in 2019. **(#14-32 at 2096)**. In February 2019, Mr. Davison scored a 15 on his PHQ-9 assessment and then scored an 11 two weeks later, indicating an improvement in his depression symptoms. **(#14-32 at 2106)**. In March 2019, upon examination, Mr. Davison: (i) appeared awake and alert; (ii) displayed normal language, speech, and fund of knowledge; (ii) had intact memory and thought processes; (iv) displayed no difficulty with attention and concentration; (v) was oriented to person, place and time; and (vi) reported a depressed mood. **(#14-32 at 2115)**. The treatment notes indicated Mr. Davison's depression and anxiety were stable and he was to continue participating in psychotherapy sessions. His medication regimen was not changed. **(#14-32 at 2115-2116)**.

**Medical Opinions**

In response to a referral from the state Disability Determination Service ("DDS"), on January 15, 2018, psychologist Victor Neufeld, Ph.D. saw Mr. Davison for a psychological consultative examination. **(#14-25 at 1580)**. This examination included an interview, record review, mental status examination, and psychological testing for intellectual and memory functioning. **(#14-25 at 1580-1582)**. Dr. Neufeld noted that Mr. Davison's interview responses suggested major depressive disorder, anxiety and ADHD. **(#14-25 at 1581-1582)**. A mental status examination revealed largely unremarkable results along with a "restricted" affect and self-described "down" mood. Mr. Davison reported concentration deficits, feeling hopeless and having thoughts that he would "rather be dead" but no current suicidal ideations. Dr.

5

Neufeld observed Mr. Davison to have logical and coherent thought processes and did not observe any impairments as to hearing, language comprehension, or language expression.  **(#14-25 at 1581-1582)**.  As to the psychological testing, Dr. Neufeld had Mr. Davison interpret proverbs, perform mathematical skills, and respond to questions testing memory function.  Based on Mr. Davison's responses, Dr. Neufeld determined he likely had: (i) limitations in abstract reasoning; (ii) no significant memory impairment; and (iii) good fund of knowledge.  **(#14-25 at 1581-1582)**.  Dr. Neufeld diagnosed Mr. Davison as suffering from moderate and recurrent major persistent depressive disorder, anxiety with agoraphobia, and ADHD.  He opined that Mr. Davison's mental disorders caused: (i) "mild to moderate impairment with recalling instructions, depending on their complexity" due to attention deficits and depression; (ii) "moderate impairment in social interaction"; and (iii) "moderate to marked impairment in persistence, pace, flexibility, and adaptability".  **(#14-25 at 1582)**.

In January 2018, James J. Wanstrath Ph.D., an agency psychological consultant, reviewed Mr. Davison's records and opined that he could perform simple work requiring up to three months to learn techniques and acquire information, could respond appropriately to supervision and co-workers, but was incapable of having more than minimal interaction with the public.  **(#17-3 at 134-135, 150-157)**.

**C.    The ALJ's Decision**

SSI is available to an individual who is financially eligible, filed an application for SSI, and is disabled as defined in the Act.  42 U.S.C. § 1382.  An individual is eligible for DIB under the Act if he or she is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act.  42 U.S.C. § 423(a)(1).  An individual is

6

determined to be under a disability only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his [or her] previous work but cannot, considering his age, education and work experience, engage in any other kind of substantial gainful work which exists in the national economy …." 42 U.S.C. § 423(d)(2)(A).

On June 3, 2019, the ALJ issued Mr. Davison an unfavorable Decision. Using the conventional multi-step analytical tool, the ALJ found at step one that Mr. Davison had not engaged in substantial gainful activity since September 13, 2015. **(#14-2 at 13)**. At step two, the ALJ found Mr. Davison had the following severe impairments: degenerative joint disease of the right knee/chondromalacia/status post arthroscopic surgery, bilateral right carpal tunnel syndrome/status post right carpal tunnel and cubital tunnel releases, degenerative disc disease of the lumbar spine, urethral strictures with surgical dilation, migraine headaches, and depressive disorder. **(#14-2 at 13)**.

At step three, the ALJ found Mr. Davison did not have an impairment that met or medically equaled the presumptively disabling conditions listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. **(#14-2 at 13)**. In making this finding, the ALJ considered Mr. Davison's mental impairments, finding he had moderate limitations in the activities of "understanding, remembering, or applying information"; "interacting with others"; and "concentrating, persisting, or maintaining pace" and mild limitations as to "adapting or managing oneself".[3] **(#14-2 at 13-**

---

[3] The ALJ's analysis followed the process for evaluating mental impairments, and the categories of such impairments, as prescribed by the Commissioner's regulations. These include the "psychiatric review technique," or "PRT," and the so-called "paragraph B" and "paragraph C" criteria for describing adult mental disorders. *See generally* 20 C.F.R. §§ 404.1520a(c)–(d); *see also* Social Security Ruling 96-8P, 1996 WL 374184, at *4 (July 2, 1996). The regulations identify four functional areas in which the ALJ will rate the degree of a claimant's functional limitations, including: (1) the ability to understand, remember or apply

**15)**.

The ALJ then assessed Mr. Davison's RFC and determined he:

> has the residual functional capacity to perform a range of light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b). The claimant can lift or carry 20 pounds occasionally and 10 pounds frequently. He can stand or walk six hours, and sit six hours, in an eight-hour workday. He can occasionally climb ladders, ropes or scaffolds. He can occasionally stoop, crouch, kneel, and crawl. He can frequently reach overhead with the right upper extremity. He can frequently handle, finger, and feel with the right upper extremity. He can tolerate frequent exposure to fumes, odors, and irritants. He cannot work at unprotected heights. He cannot work around moving or dangerous machinery. He can tolerate moderate noise levels. He should avoid bright lights (i.e., in excess of retail and office-type lighting). He is limited to simple, routine, repetitive tasks. He can have no customer service interaction with the public but can have frequent interaction with supervisors. He is able to be in proximity to co-workers throughout the day but capable of only occasional interaction.

**(#14-2 at 15)**. In making this finding, the ALJ found Dr. Wanstrath's opinion "moderately persuasive" and Dr. Neufeld's opinion to be "of limited persuasiveness". **(#14-2 at 19)**.

At step four, the ALJ found Mr. Davison unable to perform his past relevant work. **(#14-2 at 20)**. At step five, based on the testimony of the vocational expert ("VE"), the ALJ concluded that, considering Mr. Davison's age, education, work experience, and RFC, he could perform a reduced range of light jobs in the national economy such as a laundry worker, food preparer, and retail marker. **(#14-2 at 21-22)**. The ALJ therefore found Mr. Davison was not disabled as defined by the Social Security Act. **(#14-2 at 22)**.

### III. STANDARD OF REVIEW

Although the Court's review is *de novo*, the Court must uphold the Commissioner's

---

information; (2) the ability to interact with others; (3) the ability to concentrate, persist, or maintain pace; and (4) the ability to adapt or manage oneself. 20 C.F.R. § 404.1520a(c)(3).

decision if it is free from legal error and the Commissioner's factual findings are supported by substantial evidence. *See Hendron v. Colvin*, 767 F.3d 951, 954 (10th Cir. 2014); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005). Substantial evidence is evidence a reasonable person would accept to support a conclusion, requiring "more than a scintilla, but less than a preponderance." *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007); *Hendron*, 767 F.3d at 954. The Court may not reweigh the evidence, it looks to the entire record to determine if substantial evidence exists to support the Commissioner's decision. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009); *Flaherty v. Astrue*, 515 F.3d 1067, 1070 (10th Cir. 2007).

## IV. DISCUSSION

Mr. Davison raises a single issue in his appeal – that the ALJ erred at step four by improperly assessing Dr. Neufeld's mental health medical opinion. **(#18)**.

### A. RFC Determination at Step Four

The parties agree that the SSA's procedures for evaluating medical opinions and prior administrative findings changed for claims filed after March 27, 2017 and the new provisions govern Mr. Davison's claims in this appeal.[4] **(#20, #22)**. Thus, the Court begins with a brief summary of the changes to the regulations that are relevant.

Effective March 27, 2017, the SSA's revised regulations provide that an "acceptable medical source" includes a licensed (1) physician, (2) psychologist, (3) optometrist, (4) podiatrist; (5) speech pathologist; (6) audiologist; (7) advanced practice registered nurse, and (8)

---

[4] Although Mr. Davison cited the previous SSA regulation in his opening brief, his reply brief confirms his agreement that the SSA's revised procedures for evaluating medical opinions for claims filed on or after March 27, 2017 set forth in 20 C.F.R. § 416.920c govern his claims here. **(#16, #22)**.

physician assistant.[5] 20 C.F.R. § 416.902 (2018). The new regulations also provide that particular evidence, including decisions by other governmental agencies and nongovernmental entities, disability examiner findings, and statements pertaining to issues reserved to the Commissioner, is "inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled". 20 C.F.R. § 416.920b(c) (2018). Thus, the SSA "will not provide any analysis about how we considered such evidence in our determination or decision". *Id.*

The new regulations list five categories of evidence the Commissioner will receive and evaluate: (1) objective medical evidence; (2) medical opinion – a statement from a medical source as to what a claimant can do despite impairments; (3) other medical evidence from a medical source – history, clinical findings, diagnosis, judgments, treatment, and prognosis; (4) evidence from nonmedical sources – any information or statement from a nonmedical source (including the claimant) about any issue as to the claim; and (5) prior administrative medical finding – other than the ultimate determination as to disability. 20 C.F.R. § 416.913 (2018)[6].

---

[5] The new regulation added audiologists, advanced practice registered nurses, and physician assistants as acceptable medial sources. *Compare* 20 C.F.R. § 416.902(2018) with 20 C.F.R. § 416.902(2016).

[6] As to the definition of medical opinion and prior administrative finding, the regulation further provides:
> (i) Medical opinions in adult claims are about impairment-related limitations and restrictions in:
> (A) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
> (B) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace; carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;
> (C) Your ability to perform other demands of work, such as seeing, hearing,

Pertinent here, the regulations include a new section explaining the process to be used in considering medical opinions and prior administrative medical findings for claims filed on or after March 27, 2017. This provision does away with the prior treating source rule[7] and provides that the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 416.920c(a). Rather, the Commissioner must consider each medical source's opinion using the following five factors: (1) supportability; (2) consistency; (3) relationship of source to the claimant; (4) specialization; and (5) other factors that tend to support or contradict a medical opinion or prior administrative

---

        or using other senses; and
        (D) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.
\*\*\*
    (5) A prior administrative medical finding is a finding, other than the ultimate determination about whether you are disabled, about a medical issue made by our Federal and State agency medical and psychological consultants at a prior level of review (see § 416.1400) in your current claim based on their review of the evidence in your case record, such as:
        (i) The existence and severity of your impairment(s);
        (ii) The existence and severity of your symptoms;
        (iii) Statements about whether your impairment(s) meets or medically equals any listing in the Listing of Impairments in Part 404, Subpart P, Appendix 1; …
        (v) If you are an adult, your residual functional capacity;
        (vi) Whether your impairment(s) meets the duration requirement; and
        (vii) How failure to follow prescribed treatment (see § 416.930) and drug addiction and alcoholism (see § 416.935) relate to your claim.
20 C.F.R. § 416.913(a)(5) (2018).

[7]    The prior rule provided that a treating physician's opinion was generally entitled to controlling weight if it was "supported by medically acceptable laboratory and diagnostic techniques and [not] inconsistent with the other substantial evidence in [the] case record." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (citing 20 C.F.R. § 404.1527(c)(2) (2016)).

medical finding. 20 C.F.R. § 416.920c(c). The regulation states that the most important factors in evaluating the persuasiveness of medical source opinions and prior administrative findings opinion are supportability and consistency. 20 C.F.R. § 416.920c(a).

The regulation goes on to explain the articulation process that is required. The regulation requires the Decision to "explain how [it] considered the *supportability* and *consistency* factors for a medical source's opinions or prior administrative medical findings in [the] decision" but, it is "not required to explain how [it] considered the [other three] factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when [it] articulate[s] how [it] consider[s] medical opinions and prior administrative medical findings in [the] case record." 20 C.F.R. § 416.920c(b)(2) (emphasis added). Further, if the Commissioner finds "two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported … and consistent with the record … but are not exactly the same", the decision will explain the "other most persuasive factors" set forth in this section. 20 C.F.R. § 416.920c(b)(3). Finally, the regulation does not require the decision to articulate how evidence from nonmedical sources was evaluated. 20 C.F.R. § 416.920c(d).

In accordance with the new regulations, the ALJ's Decision addressed Dr. Neufeld's opinion and stated how it was credited. **(#14-2 at 19)**. The ALJ found Dr. Neufeld's opinion that Mr. Davison's major depressive disorder and anxiety caused mild, moderate, and marked impairments in the areas of assessed mental functioning to be of "limited persuasiveness" because it did not address "specific work-related functional limitations." **(#14-2 at 19)**. The ALJ explained that "[m]ild, moderate, and marked limitations do not equate to specific vocationally relevant functional limitations; thus, this opinion is of limited probative value in

12

the context of a function-by-function analysis." The ALJ further stated that the "evidence as a whole does not support an assessment of functional limitations on an ongoing basis that are inconsistent with the residual functional capacity assessed by the undersigned." **(#14-2 at 19)**.

Mr. Davison argues that the ALJ failed to follow 20 C.F.R. § 416.920c(b)(2) requiring the Decision to evaluate the supportability and consistency of Dr. Neufeld's medical opinion. The Court agrees that this oversight is reversible error.

The new regulations clearly state that supportability and consistency are the two most important factors for the ALJ to consider when evaluating medical opinions. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2)). As to supportability, the regulations state that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) ... the more persuasive the medical opinions ... will be." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). As to consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ is required to explain how he or she considered the supportability and consistency factors for a medical source's medical opinions. Here, the ALJ failed to address either factor, which was error.

Certainly, Dr. Neufeld's report contained sufficient detail for the ALJ to engage in a proper analysis. First, it described Mr. Davison's answers to interview questions explaining how his depression and anxiety affected his ability to carry out daily activities. For example, Mr. Davison reported that his anxiety hindered his ability to comfortably leave his home and

13

interact with others. Pursuant to the regulations, the ALJ should have determined whether this evidence was supported and/or consistent with the treatment notes from Mr. Davison's sessions at Aspen Pointe detailing his agoraphobia and the other mental health medical records. Second, Dr. Neufeld administered various psychological tests to Mr. Davison and opined that the results suggested functional limitations in "abstract reasoning", "working memory", and "arithmetic calculation abilities". **(#14-25 at 1581-1582)**. The ALJ should have compared these psychological test results with other record evidence to determine if there were inconsistencies. Third, Dr. Neufeld diagnosed Mr. Davison with both depression and anxiety. The ALJ should have considered whether these diagnoses were both supported and consistent with the mental health treatment notes and other pertinent record evidence.

However, the ALJ categorically discounted Dr. Neufeld's opinion because it failed to address specific work-related functional limitations. The ALJ rejected the measures of disability by "mild", "moderate" and "marked" in the established categories of mental functioning because neither the measures nor categories were tied to specific job performance or functions. Because the regulations do not require the opining medical professional to tie the established measures for mental disability to particular job functions, rejection of the opinion on this ground was legal error. In addition, because there was evidence from which the ALJ could and should have made the required assessment, and the ALJ failed to address such evidence, the ALJ's rejection of the opinion lacks support of substantial evidence.[8] Thus, the finding that Mr.

---

[8] Certainly, if the ALJ found Dr. Neufeld's report to be unclear as to how Mr. Davison's functional limitations would impact his ability to perform in a work setting, "the onus was on the ALJ to recontact [Dr. Neufeld] for further clarification." *Gonzales v.* Colvin, 69 F. Supp. 3d 1163, 1170 (D. Colo. 2014) (citing 20 C.F.R. § 416.927(c)(3)).

Davison is not disabled is reversed, and the matter is remanded for reconsideration of steps four and potentially five of the sequential analysis, applying the proper legal standards to Dr. Neufeld's medical source opinion.   The Court expresses no opinion as to the ultimate determination of whether Mr. Davison is or should be found to be disabled.

## V.   CONCLUSION

For the foregoing reasons, the Commissioner's decision is **REVERSED AND REMANDED.**   Judgment shall enter in favor of Mr. Davison.

Dated this 9th day of July, 2021.

**BY THE COURT:**

Marcia S. Krieger
Senior United States District Judge